FILED

2005 Dec-21  PM 01:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| AMANDA POWELL MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:03-cv-02884-JEO |
| | ) | |
| 2 GEORGES, INC., d/b/a | ) | |
| ON TAP SPORTS CAFÉ, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

Plaintiff Amanda Powell McCoy ("the plaintiff") filed this action, asserting various claims against 2 Georges, Inc., JASK, Inc., JASKO, Inc., Codyman, Inc., Got Beers, Inc., all of which are doing business as On Tap Sports Café, as well as Jim Morris, individually ("the defendants") under Title VII of the Civil Rights Act of 1964, as amended, and under state law for outrage, negligent retention, and negligent supervision and training. (Amended Complaint).[1] Specifically, she alleges that Morris harassed her on account of her sex and subjected her to a sexually hostile work environment and that the defendants retaliated against her after she complained of the sexual harassment. (*Id*. at pp. 4-5).

After answering the plaintiff's complaint, the defendants filed their motion for summary judgment on all of the plaintiff's claims. (Doc. 27).[2] In support of their motion, the defendants filed a brief and evidentiary materials. (Doc. 30 & 31). The plaintiff filed a brief in opposition to the defendants' motion (doc. 35) and evidentiary materials in support of her opposition (doc.

---

[1] The Amended Complaint is located at document 26, exhibit 1 in the court's record of the case.

[2] References to Doc. _____ are to the documents in the court's record as numbered by the Clerk of court.

36).  The defendants then replied to the plaintiff's opposition.  (Doc. 37).[3]  Upon consideration,

the court finds that the defendants' motion is due to be granted.

## FACTS[4]

### Plaintiff's Employment with On Tap

The plaintiff began her employment with On Tap ("On Tap" or "the defendant") in the

Fall of 1999 at its Hoover/Riverchase location, which is owned by Codyman, Inc.  (McCoy's

Deposition ("McCoy") at p. 79).[5]  In March 2002, the plaintiff went to work at On Tap's

Inverness location, which is owned by Two Georges, Inc., as an Assistant Manager.  (McCoy at

pp. 85, 129).  At the Inverness location, she received a copy of On Tap's sexual harassment

policy in her employee handbook.  (McCoy at p. 92).  On Tap's sexual harassment policy states:

> It is the policy of the restaurant that it will not tolerate verbal and physical conduct
> by an employee that harasses, disrupts, or interferes with another's work performance
> or which creates an intimidating, offensive, or hostile environment.
>
> Harassing conduct in the workplace, whether committed by supervisors or non-supervisory
> employees is prohibited.  Such conduct includes:
>
> A.    Sexual flirtations, touching, advances, or propositions
> B.    Verbal abuse of any sort
> C.    Graphic or suggestive comments about an individuals dress or body.

---

[3]Shortly before the defendants filed their motion for summary judgment and before the time the court allowed for amendments to be made, the plaintiff filed a motion to amend her complaint to allege a "single employer" liability theory, which the court allowed.  In the plaintiff's motion to amend and the defendants' opposition to that motion, the parties argued whether the plaintiff could properly assert a "single employer" liability theory.  Because the court found that the motion to amend was due to be granted and that the issue was better suited for summary judgment, the court deemed the original summary judgment moot but allowed the parties the opportunity to adopt their previously filed submissions, including their "single employer" liability arguments, which the parties did.  However, because the court finds that the defendants' motion for summary judgment is due to be granted on other grounds, it need not determine whether the defendants are a single employer for the purposes of the motion.

[4]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff.  They are the "'facts' for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Ins. Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[5]Excerpts from McCoy's deposition are located at document 31, exhibit 1 and document 36, exhibit 1.

      D.      Degrading remarks to and about anyone.

      E.      The display in the workplace of sexually aggressive objects or pictures, including nude photographs.

      F.      Advances, propositions, requests for favors, or unwelcome touches.

Any employee who believes that the actions or words of a supervisor or fellow employee constitute unwelcome harassment has a responsibility to report it to Management or the General Manager if the complaint involves a supervisor.

All complaints of harassment will be investigated promptly and confidentially.  If an employee is not satisfied with the handling of the complaint, the employee may also file a grievance of the harassment.

Any employee, supervisor, or Manager, who is found after an appropriate investigation, to have engaged in harassment of another employee will be subject to appropriate disciplinary action, up to and including termination.

(Doc. 31 at Ex. 5).  The Handbook also provides that immediate termination can result from:

1.      A no-show for an assigned shift.

2.      A negative confrontation with a customer (includes any discussion of tips).

3.      Lack of performance/inability to do the job.

4.      Any theft from the restaurant, customers, or fellow employees.

5.      Consumption of alcohol or drugs while working or arriving at work under the influence.

6.      Violation of established General Policy or House Rules.

7.      Frequent tardiness or absenteeism.

8.      Harassment of any form to a fellow employee or customer.

9.      Arguing with other employees or management.

(*Id.*).

During her employment with On Tap, the plaintiff received two write-ups.  The first was issued on April 26, 2002, and the second was issued on May 12, 2002.  (Doc. 31, Ex. 6).  On the "Record of Employee Action" form that was used by the defendants concerning the first incident, the General Manager, Wayne Wood, wrote that "Amanda called at 4:00 to ask if she could go and look at a ring.  She was scheduled at 4:00.  We had a manager meeting at 4:00!"  (*Id.*).  He recommended that the next action be suspension or possible termination and commented that

"Amanda needs to understand the importance of her job!  Being late for a meeting is unacceptable!"  (*Id*.).  The second write-up concerned the plaintiff not closing properly and sleeping in the office.  This time Wayne Wood recommended that this be her last warning and that she be terminated for her next "mess up."  (*Id*.).  He then commented that "These actions show Amanda is not committed to her job!  One more slip up and she will be terminated."  (*Id*.).

## The Alleged Discrimination

The plaintiff alleges that she was first subjected to sexual harassment while working at the Hoover/Riverchase location.  Specifically, the plaintiff testified that Morris told her about a pornographic image he had seen and asked the plaintiff if she was in the video.  According to the plaintiff:

> [Morris] called one time and said that he saw . . . a computer disk - - and said supposedly it was me giving a blow job.  And I had heard this from somebody else, and they were like, there is a disk and it looked like you or something.
>
> So I asked Jim or he called and was like yeah, I know that was you.  I said, no, it wasn't.  And he said, well, if it was then I envy your husband Ronnie because he has got such a large cock.

(McCoy Dep. at p. 117).  The plaintiff also heard from another person who formerly was a bartender for On Tap that he had either seen the video or heard about it from Jim and another employee and that it did not even look like her.  (*Id*. at pp. 120-21).  Also while she was at Riverchase, Morris commented twice that he knew the plaintiff used to be a dancer.  (*Id*. at p. 129).

The plaintiff moved to the Trussville location to prepare for its opening.  On one occasion, while working there prior to its opening, Morris moved a stud finder over his zipper and made the comment that the machine "checks for studs," and laughed.  (McCoy Dep. at pp.

4

130-131).  The plaintiff told two bartenders and Wayne Wood about the incident.  (*Id*. at p. 132).
Wood told her he would handle it but never followed up with her about it.  (*Id*.).  Also, during
this same time period, the staff went out together one night and Morris leaned over to the
plaintiff and said, "Nice pants."  The plaintiff turned to see what he was talking about and
realized that her "G-string" was exposed.  Morris then said, "Nice G-string," and she responded
that he shouldn't be looking, to which he "snickered."  (*Id*. at pp. 136-37).

On another occasion, at a server meeting, Morris told the wait staff that they needed to
carry a server tray when they left the kitchen because "you don't want your boob sitting in the
loaded nachos, you know, that really sucks walking to a table and your boob is sitting in it and
then you serve loaded nachos to these people."  (McCoy Dep. at p. 142).  Some time after that,
Morris brought up the pornographic image to the plaintiff again and told her to "open your mouth
and let me see if it is the same size that fits that cock."  (*Id*. at p. 148).  The plaintiff again
complained to Wood and he reassured her not to worry and she was alright.[6]  (*Id*. at p. 149).

The plaintiff next complains that while she and Morris were receiving a beer order, he
came out of the cooler, grabbed his nipples and said, "turkey is done," meaning that "his nipples
were out."  (McCoy Dep. at p. 150).  On another occasion, Morris called the plaintiff a midget
and told her, "Shut up, you fucking dwarf."[7]  When the plaintiff again complained to Wood, he
told her that they were in the process of buying Jim out and that he would not be around much
longer.  (*Id*. at p. 158).  Also, on a couple of occasions, the plaintiff overheard Morris make

---

[6]Wood testified that the plaintiff never complained to him of any sexual harassment but did complain "generally that [Morris] was an asshole."  (Wood Dep. at p. 66).  However, for purposes of the present motion, the court accepts the testimony offered by the plaintiff.

[7]The plaintiff is four feet eleven inches tall.  (McCoy Dep. at p. 157).

comments about a patron, such as "look at her rack." (*Id*. at p. 162).  The plaintiff also heard

Morris tell sexually explicit jokes, such as "What is the worthless part around the vagina?  A

woman." (*Id*.).  Although the plaintiff cannot remember any others, she testified that he was

"always telling some joke about a woman and boobs and vaginas." (McCoy Dep. at p. 162).  She

estimated that while she was at the Trussville location she heard 12 to 15 "dirty jokes relating to

sexual matters from [Morris]." (*Id*. at p. 164).

### Plaintiff's Termination

In May 2002, Morris terminated the plaintiff's employment after the two had an

argument about jukebox repairs.  According to Wood, in a conversation between Kevin Lather,

the plaintiff, and himself, the plaintiff commented that she knew somebody that could fix the

jukebox so she had him come in to look at it. (Wood Dep. at p. 27).[8]  Wood further testified as

follows:

> A.      . . . .  And the next thing I know Jim calls me and said he fired Amanda
> and that was that.  Said I fired her because she was insubordinate and said
> it was because of the jukebox incident, which I don't know if that was the
> case or not I wasn't there.  I know he didn't like her.  I know they didn't
> like each other.
>
> And after that Amanda called me a little while later and said that's why he
> fired her but she knew it was because that he didn't like her, he didn't
> want her there, that he was trying to push her out the door if - - basically
> what he was trying to do, saying you want to quit don't you, you want to
> quit, you want to quit.  She said he said - - he said it over and over.  And
> that was it.
>
> Q.      Did you learn at some point that he cussed her?
>
> A.      I didn't doubt that he did, but I didn't know that for sure.

---

[8]Wood's deposition is located at document 31, exhibit 4 in the court's record of the case.

Q.      You say you didn't doubt that he did, is that something he did?

A.      Something he was definitely capable of.

Q.      Now, you and Kevin had talked about the jukebox?

A.      Uh-huh.

Q.      And Kevin said get it fixed?

A.      We were all three standing right there.

Q.      Three, being Amanda, too?

A.      Amanda, myself and Kevin because I was tired of dealing with it.

Q.      And based on Kevin saying get it fixed, Amanda said I know somebody?

A.      Correct.

Q.      And Kevin and you - -

A.      Get it fixed.

Q.       - - approved her calling this other person in?

A.      The thing Kevin said was get it fixed and we'll bill the guy that owns the machine and I said that's fine, let's get it done.

Q.      Jim Morris says that he fired her for insubordination because he was responsible for that jukebox?

A.      Well, no, he's not.

. . . .

Q.      And told her repeatedly not to do anything to that jukebox without his approval. . .

A.      Okay.  Jim had stated I think probably a week before that if anything needs to get fixed in this restaurant tell me because I'm the guy that usually fixes it, which has everything to do with everything except for the jukebox.  But the jukebox is not owned by him, it's owned by the guy who services the jukebox, the game machines and everything.  He pays the bill for it to get fixed, not us.

7

Q.      And it's your understanding that you first, as general manager, and Kevin, as owner, had given Amanda permission to get this thing fixed?

A.      Yes.

Q.      And use her person?

A.      Yes.

Q.      Would you agree then that the reason for her termination by Jim was not appropriate?

A.      Yes, which I have told Kevin several times it wasn't appropriate.

Q.      Okay.  I'll show you . . . a notice of termination for Amanda Powell dated May 23, '02.  Is that your signature at the bottom?

        . . . .

A.       Uh-huh.

Q.      Did you fill this out?

A.      I did?

Q.      Why did you fill this out and not Jim Morris?

A.      Because I don't think they knew anything about paperwork.  Like I said, we're the only restaurant that did it because I did it.  I created all of these forms.  I did all of these things because I was hired on to make structure, that's why I was there.  So that's what I did.

Q.      The reasons listed, reason for termination were [sic] insubordination and general lack of work effort?

A.      Uh-huh.

Q.      Does - - those relayed to you by Jim Morris?

A.      Correct, yes.  Those are by Jim Morris.

        . . . .
A.      I just called Kevin and said, hey, Jim just fired Amanda and he said what.  And

8

from then on it was why did he do that . . . he wasn't supposed to do that without you there or me there or somebody else there.  That was the whole conversation that I recall.

Q.      Why could Jim not do it without you there?

A.      That's what Kevin had told me that he told Jim, that I was in charge of the restaurant and I made the call on who was hired and who was fired.

Q.      Do you know if anything that had happened that would prevent Jim from having the right to come in and fire Amanda?

A.      I mean, specifically, no, just that Kevin said that he wanted me to do the hiring and firing because I had the sensible head and knew how to run the business.

Q.      You mentioned earlier that there was, maybe my words, problems between Amanda and Jim?

A.      Yeah, there was problems [sic] between Jim and a lot of people actually.

Q.      Tell me what the problem was as you saw it between Amanda and Jim.

A.      They didn't like each other.  Jim owned part of that business and I guess he didn't feel that he wanted Amanda to work there.

Q.      Do you know if Amanda liked Jim?

A.      No, she did not.

    . . . .

A.      She complained about how she didn't like him, you know, just the way he handled himself.  He's very verbose, very outspoken, very loud, very I'm the owner guy, you know, trying to be the guy with the big muscles or whatever and that's just Jim's personality, you know.  And after a while it just completely didn't bother me because I figured out how he was and I just looked past it and didn't worry about it.  No, that was - - she just didn't like him.  Two clashing personalities I guess.

Q.      Were you aware at any point in time of inappropriate behavior by Jim towards Amanda?

A.      Towards Amanda, no.  Inappropriate behavior in general, yes.

9

. . .

Q.     Did she ever come to you and tell you why she didn't like him?

A.     No.  Can I be blunt?  She said because he's an asshole, that was the general consensus by most of the employees.

Q.     Okay.  Did you ever have a conversation with Jim about his attitude?

A.     I told Jim all of the time he needs to calm it down, it's not 1985 anymore.  I told him that all the time.

Q.     What do you mean by that?

A.     Well, back when  - - when I first started in the business it was very loose, it was very, you know, friendly type thing.  And since then the world has changed a lot, harassment is a big big issue now, and I know that.  Professionalism is a big deal. And I tried to tell him, I said, you know, that's not a good thing to do.  You know, calm down a little bit here, let's be a little bit more less abrasive [sic] on this and this and this.  As far as sexual, you know, just the two incidences.  You know, I told him I said - - and his comment was this is not a corporate restaurant, this is my restaurant and, you know, we're not governed by, you know, bodies that aren't here, whatever.

(Wood Dep. at pp. 27-38).[9]

According to the plaintiff, she arranged to have someone come to look at the jukebox and when Morris found out, he blew up, screamed, and cursed at her, repeatedly asking her if she was going to quit and eventually told her to hand over her keys and leave.  (McCoy Dep. at pp. 194-96).

**The EEOC Charge**

On June 28, 2002, the plaintiff filed her Charge of Discrimination with the EEOC.  (Doc.

---

[9]Although Wood does not recall Morris making any inappropriate remarks directed specifically towards the plaintiff, he does recall various incidents, including the matter involving the stud finder, the comment regarding the carrying of food on trays, sexual jokes, when Morris pulled on another staff member's thong underwear.  (Wood Dep. at pp. 35-37; 50-51).  On another occasion, another staff member told Wood that Morris pinched her on the side and when she told him not to do that, he replied, "Would you rather me pinch you on the butt?"  (Wood Dep. at p. 51).

10

31 at Ex. 8).  In response to the charge, On Tap responded by letter dated August 15, 2002, that:

> As part of the investigation all circumstances, known communications, and events involving Amanda Powell while she was employed with On Tap were thoroughly explored.
>
> As part of the investigation, comprehensive interviews with managers and employees of On Tap, who worked with Amanda Powell and Jim Morris, were held, on a one-on-one basis, independent of management or ownership, and with no persons observing.  Further, the accused individual under the charge, Jim Morris, was thoroughly interviewed regarding any communications, relationship or contact with Amanda Powell while she was employed with On Tap, including the circumstances surrounding her departure from employment.
>
> With the internal investigation of the charges having been concluded, the allegations of Amanda Powell have been found to be unsubstantiated.  As a result, On Tap formally denies the allegations against it as found in the above numbered charge.

(Doc. 36 at Ex. 9).[10]

## DISCUSSION

## Summary Judgment Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden

---

[10]The plaintiff vehemently challenges the defendants' assertion in the response that her allegations against Morris were unsubstantiated.  Her point is well taken particularly since Wood testified that he observed the "stud finder" incident.  (Wood Dep. at p. 35).  However, this fact does not impact the court's ultimate determination of the motion.

shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. (*Id.*).

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### Hostile Work Environment/ Tangible Averse Employment Action Sexual Harassment

The plaintiff asserts a hostile work environment claim premised on sexual harassment.

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001, 140 L. Ed. 2d 201 (1998).  To establish a claim for a hostile or abusive working environment, an employee must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment. . .; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076, 121 S. Ct. 772, 148 L. Ed. 2d 671 (2001) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000)).  In *Gupta*, the Eleventh Circuit stated:

> The fourth element . . . is the element that tests the mettle of most sexual harassment claims.  Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code."  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

*Gupta*, 212 F.3d at 583.  Title VII may include a prohibition of sexual harassment, but it is clearly not a federal civility code.  *Mendoza*, 195 F.3d at 1245.

"Title VII 'does not prohibit all verbal or physical harassment in the workplace,' and 'does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex.'  Instead, Title VII prohibits only the type of severe or pervasive sexual harassment that 'alter[s] the conditions of the victim's

employment.'"  *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509

(11th Cir. 2000) (quoting *Oncale*, 523 U.S. at 80-81).

In *Mendoza*, the Eleventh Circuit, sitting en banc, reiterated the standards applicable to

hostile environment claims:

> Establishing that harassing conduct was sufficiently severe or pervasive to
> alter an employee's terms or conditions of employment includes a subjective and
> an objective component. . . . .  The employee must subjectively perceive the
> harassment as sufficiently severe and pervasive to alter the terms or conditions of
> employment, and this subjective perception must be objectively reasonable.  The
> environment must be one that a reasonable person would find hostile or abusive
> and that the victim subjectively perceives to be abusive.  Furthermore, the
> objective severity of the harassment should be judged from the perspective of a
> reasonable person in the plaintiff's position, considering all the circumstances.
>
> The objective component of this analysis is somewhat fact intensive. . . .
> The courts should examine the conduct in context, not as isolated acts, and
> determine under the totality of the circumstances whether the harassing conduct is
> sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's
> employment and create a hostile or abusive working environment.

*Mendoza*, 195 F.3d at 1246 (internal quotations and citations omitted).  The Supreme Court in

*Faragher* stated, "We have made it clear that conduct must be extreme to amount to a change in

the terms and conditions of employment . . . ."  *Faragher v. City of Boca Raton*, 524 U.S. 775,

788, 118 S. Ct. 2275, 2284, 141 L. Ed. 2d 662 (1998) (citing *Carrero v. New York City Housing

Auth.*, 890 F.2d 569, 577-78 (2d Cir. 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-50 (8th

Cir. 1986).

McCoy alleges that the facts are sufficient to meet the burden described in *Faragher* and

*Gupta*.  McCoy is a member of a protected class.  She was treated in a manner that could

reasonably be considered harassment by a jury.  She asserts that the instances described by her

were sexual in nature and collectively were severe and pervasive enough to state a claim.

Because Morris was both an owner of On Tap and her supervisor at the times of the incidents, she asserts that the defendant corporations are liable for damages caused by his behavior. Thus, she asserts that the motion for summary judgment is due to be denied as to this claim.

In its motion, the defendants assert that the plaintiff's claim is due to be dismissed premised for two distinct reasons: (1) the conduct in question was not based on gender and (2) the conduct was neither severe or pervasive. (Doc. 30 at pp. 8-14).

### a. Not Based on Gender

The defendants first argue that Morris's alleged harassment was not based on gender. (Doc. 30 at p. 8). Not all of Morris's inappropriate conduct was based on sex. Specifically, the court finds that neither Morris's reference to the plaintiff being a midget or dwarf nor his comment that the "turkey is done," were based on gender. The remaining alleged incidences, however, had a sexual component to them. The defendants make the point that Morris's conduct is attributable to him being an "unpleasant owner" and that he was "unpleasant to all employees, not just females." However, the fact that Morris's behavior may have been directed to men at times does not change the fact that other more significant conduct was directed at the plaintiff and other women. There is no evidence, for instance, that he directed similar inappropriate sexual comments and innuendo towards men. Therefore, at this juncture, the court finds that the alleged conduct was sufficiently based on gender to preclude summary judgment on that ground.

### b. Not Severe and Pervasive

The defendants next argue that the alleged harassment is not severe and pervasive enough to alter the terms and conditions of the plaintiff's employment. (Doc. 30 at pp. 9-14). The law is clear that "[t]he courts should examine the conduct in context, not as isolated acts, and determine

15

under the *totality of the circumstances* whether the harassing conduct is sufficiently severe or

pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or

abusive working environment." *Mendoza*, 195 F.3d at 1246 (emphasis added).  The defendants

allege that McCoy was not subjected to any physically threatening conduct or physical touching

and was, at most, subjected to conduct that was humiliating.  (Doc. 30 at p. 13).  In reviewing

this claim, it must also be remembered that even though the incidents individually may not

constitute a Title VII claim, together they may be significant enough to overcome the motion for

summary judgment.

A look at *Mendoza* and the litany of case examples discussed therein where courts have

found the conduct to be insufficient is appropriate at this juncture.  The *Mendoza* court cited the

following:

> Other circuits have applied these factors to delineate a minimum level of
> severity or pervasiveness necessary for harassing conduct to constitute
> discrimination in violation of Title VII.  Many decisions throughout the circuits
> have rejected sexual-harassment claims based on conduct that is as serious or
> more serious than the conduct at issue in this appeal.  *Shepherd v. Comptroller of
> Public Accounts of Texas*, 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that
> several incidents over a two-year period, including [the] comment "your elbows
> are the same color as your nipples," another comment that plaintiff had big thighs,
> touching plaintiff's arm, and attempts to look down the plaintiff's dress, were
> insufficient to support hostile-environment claim); *Indest v. Freeman Decorating,
> Inc*., 164 F.3d 258, 264-67 (5th Cir. 1999) (noting it was "dubious" whether
> several sexually oriented comments and gestures and an implied threat of
> retaliation for refusing a sexual advance would be sufficient to establish a hostile
> environment); *Quinn v. Green Tree Credit Corp*., 159 F.3d 759, 768 (2d Cir.
> 1998) (holding that statement that plaintiff had the "sleekest ass" in the office plus
> single incident of "deliberately" touching plaintiff's "breasts with some papers
> that he was holding in his hand" were insufficient to alter the terms or conditions
> of the plaintiff's employment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357
> (7th Cir. 1998) (holding actions insufficient to support hostile environment claim
> where co-employees teased plaintiff, made sexual jokes aimed at her, asked her
> what "putting one rubber band on top and another on the bottom means,"

commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding five "sexually-oriented, offensive" statements over sixteen months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can"); *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167-68 (7th Cir. 1996) (holding offensive comments including repeatedly calling the plaintiff a "sick bitch" insufficient under *Harris* because not necessarily gender-related); *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753-54 (4th Cir. 1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823-24 (6th Cir. 1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns"; suggesting land area be named as "Titsville" or "Twin Peaks"; asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables?"; stating, "Just get the broad to sign it"; telling plaintiff she was "paid great money for a woman"; laughing when plaintiff mentioned the name of Dr. Paul Busam, apparently pronounced as "bosom"); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (holding insufficiently severe or pervasive to support a hostile-environment claim nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); *Kidwai v. McDonald's Corp.*, No. 93-1720, 1994 WL 136971 (4th Cir. 1994) (holding insufficient under *Harris* seven incidents, including one instance in which harasser asked plaintiff whether "she was in bed with someone"); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (holding plaintiff's claims--supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work--were not sufficient for actionable sexual harassment); *see also DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace."); *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting,

unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

*Mendoza*, 195 F.3d at 1246-47.  The court went on to state the following:

> In this appeal, the conduct alleged by Mendoza falls well short of the level of either severe or pervasive conduct sufficient to alter Mendoza's terms or conditions of employment.  Construing the evidence in the light most favorable to Mendoza, she presented evidence of four categories of harassing conduct: (1) one instance in which Page said to Mendoza "I'm getting fired up"; (2) one occasion in which Page rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which Page made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) Page's "constant" following and staring at Mendoza in a "very obvious fashion."
>
> As an initial matter, whether Page's conduct testified to by Mendoza includes the necessary sexual or other gender-related connotations to be actionable sex discrimination is questionable. . . .

*Id*. at 1247.

In *Gupta*, the complained-of conduct consisted of the following acts over a six to seven month period: (1) "look[ing her] up and down," (2) suggesting lunch at Hooters restaurant, (3) suggesting that she "change into casual attire before dinner," (4) accompanying her and another couple to "a place where single people meet," (5) offering assistance if she needed anything, (6) changing her office to one across from the alleged harasser when she complained her office was too small, (7) offering to drop food at her house, (8) calling her at home two or three times a week late at night and asking if she was in bed, (9) asking if she had a boyfriend, (10) asking her to lunch, (11) calling other faculty members "racist" and "evil," (12) putting a hand on her thigh in the office, (13) touching her bracelet and saying, "Oh, it is a very nice bracelet," (14) touching her ring, (15) touching and lifting the hem of her dress and commenting, "What kind of material is that?," (16) on a hot day when the air conditioning was broken, Gupta

18

walked into the alleged harasser's office when he was expecting her and he had taken off his

dress shirt and was wearing an undershirt and "he unbuckled his belt and pulled down his zipper

and start[ed] tucking his [dress] shirt in, (17) making comments that she was "looking very

beautiful" and that "Indian people are really decent, and the Caribbean and Western people are

really promiscuous" and stating that he could tell that she was "innocent and [ ] didn't have much

experience," (18) after a storm, commenting that she should have called him since she was alone

and he would have spent the night,[11] and (19) other looks that made her uncomfortable.  *Gupta*,

212 F.3d at 578-79.

      After a jury rendered a verdict for the plaintiff, the Eleventh Circuit held that the evidence

did not support a finding of harassment from an objective viewpoint.  Specifically, the court

stated:

>       Except for the phone calls to her home, none of Rhodd's conduct can be
> described as frequent.  Gupta testified that Rhodd phoned her often at 9:30 or
> 10:00 at night, and over the weekends, and sometimes asked her personal
> questions during these phone calls.  [ ]  While Gupta testified that these phone
> calls were frequent, she never contended that they were intimidating or
> threatening.  At no point during these phone calls did Rhodd ask Gupta for a date
> or make sexually explicit remarks or innuendos.  [ ]  Neither the content of
> Rhodd's remarks nor the number of the phone calls suggests obsessive or
> stalker-like behavior by Rhodd.  While frequently calling an employee at home
> and making even innocuous inquiries may be annoying or inappropriate behavior,
> it does not equal severe or pervasive sexual harassment--if it is sexually harassing
> conduct at all.  As for Rhodd's comments about the promiscuity of people from
> Jamaica as compared to the innocence of people from India, and the opinion he
> expressed of women, those statements were far from laudatory, but they were also
> isolated utterances over a period of several months.
>
>     . . . .  Gupta did not contend that Rhodd made any inappropriate gestures
> or comments toward her when he tucked in his shirt.  His conduct on this isolated

---

[11] Gupta understood this as a suggestion "that he wanted to [have a] sexual relationship with [her]."  *Gupta*, 212 F.3d at 579.

occasion was not "physically threatening or humiliating."  . . . .

. . . . Gupta cannot establish her hostile environment claim with allegations that Rhodd stared at her twice, touched her ring and bracelet once, and kept asking her to lunch.  Assuming it was sexual in nature, none of that conduct was severe, threatening, or humiliating.  As the Supreme Court has observed, in a normal office setting interaction between employees is to be expected.  . . . .  What one employee might perceive as conduct which crosses the proverbial line, another might perceive as banter.  We cannot mandate that "an employer [ ] be required under pain of legal sanctions to ensure that supervisors never look or stare at a subordinate whom they are supervising in such a way that she might think they are 'coming on' to her." . . . .  Nor can we mandate that an employer be required to ensure that supervisors never touch employees on the hand or finger or ask them to lunch.

Of all the conduct about which Gupta complains, the most serious is Rhodd's placing his hand on her knee once, and his touching the hem of her dress once.  He should not have done either of those things.  But those were only two incidents in a period of six or seven months during which they were interacting (out of an even longer period during which the two worked for the University).  Each incident was only momentary, and neither was coupled with any verbal suggestions or advances. . . .

. . . .  The standard does have an objective component, and applying it we conclude that the conduct and statements in question would not have interfered with a reasonable employee's performance of her job.

We are aware of our duty to examine and consider all of the behavior and conduct of a sexually or gender-related nature collectively in determining whether it meets the "sufficiently severe or pervasive" requirement.  We have done so, and it does not.  The alleged harassment in this case exemplifies "the ordinary tribulations of the workplace," *Faragher*, 524 U.S. at 788, 118 S. Ct. at 2284, which the Supreme Court and this Court have held do not constitute actionable sexual harassment.  Gupta failed to present evidence that Rhodd's conduct was in any way "physically threatening or humiliating," or that a reasonable person would view the conduct as "severe."  *Mendoza*, 195 F.3d at 1246.  The Fifth Circuit recently opined, "All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment."  *Indest v. Freeman Decorating, Inc*., 164 F.3d 258, 264 (5th Cir. 1999) (citations omitted).  This is not such a case.

Furthermore, a finding that Gupta's complaints constitute sexual

harassment would lower the bar of Title VII to punish mere bothersome and uncomfortable conduct, and would "trivialize true instances of sexual harassment." *Mendoza*, 195 F.3d at 1252 n.10.  Based upon *Mendoza*, we hold that there was insufficient evidence presented at trial to support the jury's verdict finding the Board liable for hostile environment sexual harassment under Title VII, and we reverse the judgment of the district court on that claim.

In a more recent case, *Johnson v. Booker T. Washington Broadcasting Service, Inc*., 234 F.3d 501 (11th Cir. 2000), the Eleventh Circuit reversed the granting of a motion for summary judgment.  The plaintiff claimed that she was sexually harassed when (1) Donnell repeatedly commented that Johnson had a sexy voice; (2) Donnell called out Johnson's name and winked at her; (3) Donnell called out Johnson's name and pulled his pants up in an obscene manner, revealing an imprint of his private parts; (4) Donnell called out Johnson's name and then looked her "up and down" while staring at her in a sexual manner; (5) Donnell said "Johnson, I like you and as long as I like you you're going to be all right.  You don't have to worry about your job;" (6) Donnell repeatedly attempted to massage Johnson's shoulders against her wishes; (7) Donnell stuck his tongue out at Johnson in an obscene manner; (8) Donnell inappropriately rubbed his body parts against Johnson; (9) Donnell asked Johnson why a person with a body like hers always covered it up; (10) Donnell commented that he could "pull [Johnson] up" anytime, a comment Johnson interpreted as a sexual reference; (11) Donnell got close to Johnson's face as if to kiss her; (12) Donnell commented that Johnson "really knocked him off his feet;" (13) Donnell stated that "he had to stay on his side of the room;" (14) Donnell commented inappropriately about sex to Johnson and questioned Johnson about her sex life; and (15) Donnell asked Johnson if she ever got lonely.  *Johnson*, 234 F.3d at 506.  The court stated:

There is no doubt Johnson subjectively perceived Donnell's behavior as harassing.  Turning to the four objective factors: the conduct alleged by Johnson

21

was not infrequent (Johnson points to roughly fifteen separate instances of
harassment over the course of four months); the conduct was severe (Donnell's
behavior included giving Johnson unwanted massages, standing so close to
Johnson that his body parts touched her from behind, and pulling his pants tight to
reveal the imprint of his private parts); the conduct was physically threatening and
humiliating (same); and the conduct interfered with Johnson's job performance
(she could not get along with her on-the-air co-host). This set of facts differs from
cases like *Mendoza* and *Gupta v. Florida Bd. of Regents*, where there were fewer
instances of less objectionable conduct over longer periods of time. *See Mendoza*
195 F.3d at 1242-43; *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 585 (11th
Cir. 2000). The facts of this case are more akin to the "continuous barrage of
sexual harassment" in *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417,
418 (11th Cir. 1999).

*Id.* at 509.  In *Dees*, the conduct consisted of the following:

sexually explicit stories and jokes, to comments about her body or those of male
firefighters, to physical harassment. On one particularly humiliating occasion,
Jacobs asked Dees to sit on his lap. When she refused, Jacobs picked her up and
squeezed her so hard that she urinated in her pants. Jacobs, laughing, then told the
other firefighters what had happened. On another occasion, Stewart ground his
groin into Dees' buttocks after stating "look at that sexy mama, I could just eat
you in that skirt." Rainey propositioned Dees on a number of occasions,
whispering in her ear that she was "the kind of woman I like; you're not only
beautiful, you're hot-blooded," or telling her that she needed a "sugar daddy" and
that with a body like hers, she would not have to work if she listened to him. On
numerous other instances, the four men grabbed or slapped Dees' buttocks,
groped her leg, or otherwise touched her in a sexually suggestive manner.

*Dees*, 168 F.3d at 418-19. The *Dees* court noted in *dicta* that "it is evident both that Dees

subjectively found her work environment abusive, and that a reasonable person would find it so."

*Id.* at 422 n.12.

The conduct in the present case does not fit squarely within the parameters of any of the

foregoing cases. The incidents in *Mendoza* were less severe than some of the incidents in this

case. Like *Mendoza,* many of the comments in the instant case were arguably not sexual or

gender-related. However, *Mendoza* involved slight touching, while this case does not involve

any touching at all.  Although there were numerous instances in *Gupta*, many were not sexual or

gender-related.  Each incident of touching in *Gupta* "was only momentary, and neither was

coupled with any verbal suggestions or advances."  *Gupta*, 212 F.3d at 585.  *Johnson*, involved

much more significant and physical contact.  The court described the conduct as "physically

threatening and humiliating" and interfering with the plaintiff's ability to work.  *Johnson*, 243

F.3d at 509.  The conduct in *Dees* was much more severe.  It was focused directly at the plaintiff,

it was extensive, and it involved physical touching.  As best this court can discern, the incidents

alleged in this case happened over a period of only a few months and none of them occurred

frequently.[12]  Premised upon application of the forgoing authorities to the present facts, the court

finds for the reasons set out herein that the conduct the plaintiff complains of was not "permeated

with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment."

*Oncale*, 523 U.S. at 78.

Of the conduct McCoy complains about, the conduct directed specifically towards her

was: (1) the video incident; (2) the "g-string" incident; (3) Morris's comments that he knew what

she used to do; and (4) the incident wherein he called her a midget.  Additionally, she

experienced his comments regarding the carrying of food and his jokes.  These alleged incidents,

although inappropriate and offensive, simply do not rise to the level enunciated by the Eleventh

Circuit and the United States Supreme Court for severe and pervasive conduct that is actionable.

---

[12]The most common event would be Morris's telling sexually charged jokes.  As noted earlier, this occurred about 12 to 15 times during the entire period.

Therefore, summary judgment is due to be entered on the plaintiff's sexual harassment claim.[13]

## Retaliation

The plaintiff next contends that she was terminated in retaliation for objecting to Morris's sexually harassing conduct and engaging in protected activity.  As stated by the United States Supreme Court:

> Under Title VII of the Civil Rights Act of 1964, 78 Stat. 255, as amended, 42 U.S.C. § 2000e-3(a), it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."

*Clark County School Dist. v. Breeden*, 532 U.S. 268, 269, 121 S. Ct. 1508, 1509, 109 L. Ed. 2d 509 (2001).  The plaintiff complains that she was terminated in retaliation for objecting to Morris's sexually harassing conduct and engaging in protected activity.  The defendant contends, instead, that she was terminated for insubordination and lack of work effort.  (Doc. 30 at p. 20).

The appropriate framework from which to evaluate the plaintiff's retaliation claim is the familiar *McDonnell Douglas* standard used in disparate treatment cases.  The plaintiff has the

---

[13]The defendants also argue that they are not liable for the alleged sexual harassment because they exercised reasonable care to prevent and correct any harassing behavior and because the plaintiff failed to take advantage of the preventative measures that were available.  (Doc. 30 at pp. 15-16).  To support this argument, the defendants note that they had a policy in place that prohibited sexual harassment, that the plaintiff received the Handbook and was aware of the policy, and that the plaintiff failed to make any complaints to the majority shareholders of On Tap.

As discussed previously, McCoy alleges that she complained to Wood who was the General Manager of the Trussville location.  That course of action is consistent with the On Tap harassment policy, which states:

> Any employee who believes that the actions or words of a supervisor or fellow employee constitute unwelcome harassment has a responsibility to report it to Management or the General Manager if the complaint involves a supervisor.

(Doc. 31 at Ex. 5).  The court finds that, had the plaintiff established a prima facie case, her complaints to Wood would have been sufficient under the policy in place to overcome the defendants motion for summary judgment under *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) and *Burlington Indus. v. Ellereth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).

initial "burden of establishing a prima facie case." *McDonnell Douglas,* 411 U.S. 792, 802, 93 S.

Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973). "If a plaintiff establishes a prima facie case of

[retaliation], the defendant employer must articulate a legitimate, nondiscriminatory reason for

the challenged employment action." *Chambers v. Walt Disney World, Co.*, 132 F. Supp. 2d

1356, 1365 (M.D. Fla.) (quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000)

(en banc)). Once a defendant has articulated its legitimate, nondiscriminatory reasons for the

plaintiff's termination, the court "must, in view of all the evidence, determine whether the

plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to

permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were

not what actually motivated its conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538

(11th Cir.), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997) (citing

*Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). This must include an

evaluation of "whether the plaintiff has demonstrated 'such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable fact finder could find them unworthy of credence.'" *Combs*, 106

F.3d at 1538. If it is "determine[d] that a reasonable jury could conclude that the employer's

articulated reasons were not the real reason for its decision, the court may not preempt the jury's

role of determining whether to draw an inference of intentional discrimination from the

plaintiff's prima facie case taken together with rejection of the employer's explanations for its

action." *(Id.).*

    To establish a prima facie case of retaliation, the plaintiff must prove three elements:

(1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment

action; and (3) that the adverse employment action was causally related to the protected activity.
*Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998), *cert. denied*,
525 U.S. 1000, 119 S. Ct. 509, 142 L. Ed. 2d 422 (1998).

In the instant case, the defendants contest the first and third prongs.  Construing the facts
in a light most favorable to the plaintiff, she engaged in the protected activity of complaining to
Wood as the General Manager.  The defendants retort that because "no reasonable person could
conclude that the limited incidents alleged by the plaintiff created a sexually hostile environment
in the sports bar in which she was working that altered her working environment amounting to
sexual harassment as that term is defined by the weight of case precedent," her claim does not
rise to the level of protected activity because it did not amount to a complaint of sexual
harassment.  (Doc. 30 at p. 18).  The court disagrees.  For summary judgment purposes, the court
finds it sufficient that the plaintiff believed she was subjected to sexual harassment for her
complaints to Wood to be deemed protected activities.  *See Harper v. Blockbuster Entertainment
Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998) (Finding that employee engages in protected activity
when she has a good faith and reasonable belief that the underlying employment practice was
unlawful).

Because the court finds that the plaintiff engaged in protected activity for the purposes of
this motion, it must next determine whether her termination was causally related to her protected
activity.  The plaintiff asserts that because she suffered an adverse employment action soon after
her alleged complaints to Wood, a causal connection exists between the two.  (Doc. 35 at p. 36).

United States District Judge Robert B. Propst addressed the issue of what constitutes a
causal relationship in the retaliation context in *Taylor v. Renfro Corp.*, 84 F. Supp. 2d 1248

26

(N.D. Ala. 2000).  He stated:

> The Eleventh Circuit "interpret[s] 'the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Meeks v. Computer Assoc. International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Reichhold*, 988 F.2d at 1564).  The Eleventh Circuit also does "not construe the 'causal link' . . . to be the sort of logical connection that would justify a prescription that the protected [activity] in fact prompted the adverse action.  Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).  And while not a per se requirement, courts do consider the amount of time lapsed between the time of the complaint and the time of the adverse employment action.  *See Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1556 (11th Cir. 1995); *Maniccia v. Brown*, 171 F.3d 1364, 1369-70 (11th Cir. 1999).

> A causal link has been found sufficient to withstand a defendant's motion for summary judgement, for example, where an employer discovered an employee's EEOC charge and a series of adverse employment actions commenced almost immediately, *Wideman*, 141 F.3d at 1457; where a supervisor was displeased with a HEW investigation and associated the employee who suffered adverse employment action with the investigation, *Simmons*, 757 F.2d at 1189; and where a plaintiff complained of sexual harassment in June, 1995, was terminated in April, 1997, and the plaintiff's performance evaluations for her 18 years of employment had been favorable, *Mortenson*, 54 F. Supp. 2d at 1124-25.

> A causal link has not been found, for example, where the plaintiff failed a test and passing the test was necessary for being offered the job at issue, *Fleming v. Boeing Co.*, 120 F.3d 242, 248 (11th Cir. 1997); where the adverse employment action occurred 15 and 21 months, respectively, after the plaintiff filed a grievance against her employer, *Maniccia*, 171 F.3d at 1370 ("The only causal connection established by the evidence is between Appellant's misconduct and her termination."); where the plaintiff failed to complete necessary management tasks, had a poor working relationship, and refused to accept constructive criticism, *Coutu*, 47 F.3d at 1074-75; where the time lapse between plaintiff's complaint and her termination was 16 months, *Aldridge*, 847 F. Supp. at 486; and where plaintiff's complaint was thoroughly investigated, a detailed report was filed concerning the investigation, the subject of the complaint was sanctioned, strenuous efforts were made to put plaintiff into another position within the company, and plaintiff was ultimately terminated six months after her complaint was filed, *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1555 (11th Cir. 1997).

In this case, plaintiff was terminated approximately four months after her last formal complaint regarding Richardson's conduct. The ensuing investigation consisted of Todd asking Richardson and Ingle what had happened (but did not include asking plaintiff what had happened), and cautioning Richardson and Ingle to not say things which might be misinterpreted by other employees. She was terminated for recounting socks in violation of company policy. She admitted to recounting socks, but claimed it was inadvertent. Viewing the situation in the light most favorable to the plaintiff, she made three "formal" complaints, and she allegedly made numerous "informal" complaints up to January of 1997, one month prior to her termination. Her work record prior to February 21, 1997, had been unblemished. Richardson characterized her as a very good worker.[ ] Richardson was also aware that Taylor had complained to Bennett about his conduct.[ ] She was terminated on her first mistake, despite the fact that she admitted the error and gave an explanation for it. Based on this, it does not appear that the employment action and plaintiff's complaints were wholly unrelated. Thus, plaintiff has satisfied the third prong.

*Taylor*, 84 F. Supp. 2d at 1259-60 (footnotes omitted).

After reviewing the foregoing cases and the discussions therein, the court finds that the inquiry necessary to determine whether the requisite causal relationship has been established is very case specific. No one aspect of the consideration is necessarily determinative. Under the present facts, the court finds that the causal relationship between the plaintiff's complaint and her termination is not sufficiently established to defeat the defendants' motion. Although the plaintiff's termination was closely linked in time to her alleged complaints, the record is unclear as to just how close.[14] Nonetheless, the court assumes for summary judgment purposes that the proximity in time is sufficiently related. However, the present record is devoid of any evidence that Morris was aware of the complaints made by the plaintiff to Wood. To the contrary, Wood testified that the plaintiff had never complained of sexual harassment but had complained that

---

[14]The plaintiff asserts that all of the conduct occurred during the two month span that she worked at the Trussville location (although she also alleges that the "blow job" incident occurred at the Riverchase location) but does not assert when the last complaint was made.

28

Morris was generally an "asshole."  (Wood Dep. at 38).  However, the court is treating her

complaints more broadly based on her testimony.

 Even after broadly construing the plaintiff's testimony, there is still no evidence that

Morris was aware that the plaintiff had made a complaint of sexual harassment against him.

Although Wood talked with Morris "about his attitude," that simply is not enough to satisfy this

element.  Additionally, under the present circumstances, it would be inappropriate for this court

to simply rely on the temporal proximity of the events.  In *Brungart v. BellSouth*

*Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000), the court noted as follows:

> In order to show the two things were not entirely unrelated, the plaintiff must
> generally show that the decision maker was aware of the protected conduct at the
> time of the adverse employment action.  *See Goldsmith v. City of Atmore*, 996
> F.2d 1155, 1163 (11th Cir. 1993); *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d
> 1192, 1197 (11th Cir. 1997) ("[I]n a case involving a corporate defendant the
> plaintiff must show that the corporate agent who took the adverse action was
> aware of the plaintiff's protected expression....").  That requirement rests upon
> common sense.  A decision maker cannot have been motivated to retaliate by
> something unknown to him.  As with most facts, the defendant's awareness can be
> established by circumstantial evidence.  *See Goldsmith*, 996 F.2d at 1163.
>
> The general rule is that close temporal proximity between the employee's
> protected conduct and the adverse employment action is sufficient circumstantial
> evidence to create a genuine issue of material fact of a causal connection.  *See
> Gupta*, 212 F.3d at 590; *Bechtel Constr. Co. v. Secretary of Labor*, 50 F.3d 926,
> 934 (11th Cir. 1995) ("Proximity in time is sufficient to raise an inference of
> causation.").  However, there is this exception: temporal proximity alone is
> insufficient to create a genuine issue of fact as to causal connection where there is
> unrebutted evidence that the decision maker did not have knowledge that the
> employee engaged in protected conduct.  *See Clover*, 176 F.3d at 1355-56.  In
> *Clover* the plaintiff, who brought a Title VII retaliation claim, had been informed
> the day after she engaged in protected conduct that she was going to be
> terminated, and later she was terminated.  *Id*. at 1349. Notwithstanding the close
> temporal proximity between the protected conduct and the initial decision to
> terminate the plaintiff, we reversed the district court's denial of the defendant's
> motion for judgment as a matter of law on the retaliation claim.  *See id*. at
> 1355-56.  We did so because the plaintiff "failed to present sufficient evidence to

29

> establish that [the decision maker] was aware of her protected conduct." *Id*. at 1356.  Exactly the same situation is before us in this case, and the *Clover* decision compels the same result.

As stated previously, the record in the instant case fails to exhibit that Morris was aware of any complaint made by the plaintiff, let alone a complaint of sexual harassment.  What the record does reflect is that the plaintiff and Morris did not get along, that Morris did not get along with most of the On Tap employees, and Wood talked with him regarding that situation.  (See Wood Dep. at pp. 27-28).

Based upon application of Eleventh Circuit case law to the facts of the instant case, the court finds that the plaintiff has failed to sufficiently show that her termination was causally related to her alleged complaints of sexual harassment to Wood.  Therefore, summary judgment is due to be granted on this claim.[15]

### Negligent and/or Wanton and Malicious Training, Supervision, and Retention

The plaintiff next alleges that the defendants were negligent in training, supervising, and retaining Morris after they had knowledge of his sexually harassing conduct.  (Amended Complaint at ¶¶ 38-52).  In support of this claim, the plaintiff states that the defendants had knowledge of Morris's conduct and failed to remedy the situation.  (*Id*. at ¶ 41).

The defendants assert that this claim is due to be dismissed on summary judgment because the plaintiff's allegations do not amount to sexual harassment and the plaintiff failed to complain to the majority owners of On Tap about the alleged conduct so that they could respond.

The court in *Kelley v. Worley*, 29 F. Supp. 2d 1304 (M.D. Ala. 1998), stated as follows

---

[15]Because the court finds that the plaintiff has not stated a *prima facie* case, it pretermits any discussion regarding whether the plaintiff has demonstrated pretext.

concerning negligent hiring, retention, and supervision claims:

> The Alabama Supreme Court has stated that in the context of a master and servant relationship, such as that between the corporate Defendants and [the employee], "the master is held responsible for the servant's incompetency when notice or knowledge, either actual or presumed, of the incompetency has been brought to the master." *See Mardis v. Robbins Tire & Rubber Co.,* 669 So. 2d 885, 889 (Ala. 1995). For the master to be held liable for the servant's incompetency, it must be affirmatively shown that had the master exercised due and proper diligence, the master would have learned of the incompetency. *Id*. This may be done by showing specific acts of incompetency and showing that they were brought to the knowledge of the master, or by showing them to be of such a nature, character, and frequency that the master, in the exercise of due care, must have had notice of them. *Id*.

*Kelley*, 29 F. Supp. 2d at 1313. To prove her claim, the plaintiff must demonstrate (1) the underlying tortious conduct of the offending person (usually an employee), (2) actual knowledge of the same, (3) that based on this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort, and (4) that the employer failed to take adequate steps to remedy the situation. *Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981, 985 (Ala. 1999) (quoting *Potts v. BE & K Const. Co.*, 604 So. 2d 398, 400 (Ala. 1992)).

In view of the fact that the plaintiff has not demonstrated the requisite underlying tortious conduct, the court finds that the defendants' motion on this claim must be granted as well. Because the defendants' motion for summary judgment is due to be granted on the other claims (sexual harassment, retaliation, and outrage), the plaintiff cannot satisfy the first requirement for stating a claim. To the extent that the plaintiff relies on *Machen*, the court finds it distinguishable. In that case, the Alabama Supreme Court reversed the granting of summary judgment premised on the fact that there was "a genuine issue of material fact as to whether the

bank defendants took adequate steps to investigate Machen's complaint of sexual harassment and

to train bank employees. . . ." *Id.*, 761 So. 2d at 987.  Unlike the present case, in *Machen*, there

was not an issue of whether the plaintiff had demonstrated the underlying tortious conduct of

assault and battery, invasion of privacy, and outrage.[16]

### Outrage

Finally, the plaintiff advances a claim of outrage against the defendants.  She states that

the defendants "outrageously and intentionally inflicted emotional distress upon [her] by

subjecting her [to] sexually abusive, profane, insensitive and unprofessional language."

(Amended Complaint at ¶¶ 30, 31, 32).  The defendants assert that the plaintiff has not and

cannot state such a claim under the facts.  (Doc. 30 at pp. 21-22).

The Alabama Supreme Court recently stated as follows:

> The tort of outrage was first recognized by this Court in *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981).  In that case Inmon, who had formerly been employed as a claims supervisor by American Road Service Company, sued his former employer, alleging that he had been mistreated during the events leading to his termination and that that mistreatment had constituted outrageous conduct; he argued that outrageous conduct should be recognized as a tort.  In *Inmon*, this Court recognized such a tort.  It discussed the requirements of the tort, emphasizing the extreme nature of the defendant's conduct that would be sufficient to constitute the tort, and the severity of the emotional distress that would entitle a person to recover for that tort:
>
>> "The emotional distress [caused by the defendant's conduct] must be so severe that no reasonable person could be expected to endure it.  Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme.  Comment, Restatement [(Second) of Torts], at 78. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be

---

[16]The offending conduct in *Machen* involved numerous instances of sexual harassment that included grabbing the plaintiff, pulling her on the bank officer's lap, and "rubbing her thighs."  *Machen*, 761 So. 2d at 983.

> regarded as atrocious and utterly intolerable in a civilized society.
> [Cmt. d], Restatement, supra at 72."

> The tort of outrage is an extremely limited cause of action.  It is so limited
> that this Court has recognized it in regard to only three kinds of conduct:
> (1) wrongful conduct in the family-burial context, *Whitt v. Hulsey*, 519 So. 2d 901
> (Ala. 1987); (2) barbaric methods employed to coerce an insurance settlement,
> *National Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983); and
> (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp*., 551 So. 2d 322
> (Ala. 1989).  *See also* Michael L. Roberts and Gregory S. Cusimano, Alabama
> Tort Law, § 23.0 (2d ed. 1996).  In order to recover, a plaintiff must demonstrate
> that the defendant's conduct "(1) was intentional or reckless; (2) was extreme and
> outrageous; and (3) caused emotional distress so severe that no reasonable person
> could be expected to endure it."  *Green Tree Acceptance, Inc. v. Standridge*, 565
> So. 2d 38, 44 (Ala. 1990) (citing *American Road Service Co. v. Inmon* ).

*Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000).  The plaintiff states that the entirety of the

defendants' conduct constitutes the tort of outrage.  Specifically, she states that the "discussions

of 'blow jobs'"; use of the word "cock" on more than one occasion; jokes about women's [sic]

vagina and other body parts; asking plaintiff to open her mouth to see if a "large cock" would fit;

repeated comments about female's [sic] breasts, nipples and bodies; repeated comments about

female's [sic] bras and panties; snide sexual comments; sexually perverted gestures; demeaning

and degrading remarks towards plaintiff; and terminating plaintiff based on unsubstantiated and

false reasons" is sufficient to overcome the motion for summary judgment.  (Doc. 35 at p. 42).

> Accepting the plaintiff's allegations for the purposes of discussion, the court finds that

they are insufficient to overcome the motion for summary judgment.  The Alabama Supreme

Court in recognizing the tort of outrage stated over twenty years ago that

> we now recognize that one who by extreme and outrageous conduct intentionally
> or recklessly causes severe emotional distress to another is subject to liability for
> such emotional distress and for bodily harm resulting from the distress.  The
> emotional distress thereunder must be so severe that no reasonable person could
> be expected to endure it.  Any recovery must be reasonable and justified under the

> circumstances, liability ensuing only when the conduct is extreme.  Comment,
> Restatement, *supra*, at 78.  By extreme we refer to conduct so outrageous in
> character and so extreme in degree as to go beyond all possible bounds of
> decency, and to be regarded as atrocious and utterly intolerable in a civilized
> society.  Comment (d), Restatement, *supra* at 72.  See also Prosser, *Law of Torts*
> (4th ed.) at 56-60 and Wade, *supra*, for instances which clearly fall within the
> principle.

*Inmon,* 394 So. 2d at 365.  Morris's actions certainly are reprehensible, but they are insufficient

to constitute "conduct so outrageous in character and so extreme in degree as to go beyond all

possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized

society."  *Id*.  The standard is very high to avoid summary judgment on an outrage claim.  The

plaintiff does not and cannot meet it.  The motion is due to be granted.

## CONCLUSION

Based on the foregoing, the court finds that the defendants' motion for summary

judgment is due to be granted in its entirety and the plaintiff's complaint is due to be dismissed

with prejudice.  An appropriate order will be entered contemporaneously herewith.

**DONE**, this the 21st day of December, 2005.

**JOHN E. OTT**
United States Magistrate Judge

34